# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHROMALOX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 20-1475 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| MARK CROMBIE, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER

Having conducted a Hearing on Plaintiff's Motion for Preliminary Injunction (Doc. 3), the Court makes the following Findings and Conclusions by a preponderance of the evidence.

## FINDINGS OF FACT

1. Chromalox manufactures electric process heating and heat trace equipment. 1/8/21 Transcript (Doc. 32, hereinafter "Tr.") 35:24-25. It was acquired by Spirax Sarco ("Spirax") on July 1, 2017. Tr. 38:25, 39:1-4.

2. The market Chromalox serves is broken into three product segments: heat trace, industrial heaters and systems, and component heat technologies. Tr. 36:1-5. Chromalox's annual sales are approximately $200 million. Tr. 36:9-15. About 25% of those sales, and about 35% of Chromalox's profits, are from heat trace. *Id*.

3. Chromalox conducts direct sales to customers; and sales through intermediaries like distributors, resellers and factory representatives ("channel partners") that buy its products to resell them in the marketplace. Tr. 51:1-9, 17-23. It also sells to engineering firms that purchase

products from Chromalox to engineer them into end user systems, and to contractors who buy equipment and install it for an end user customer. Tr. 51:10-16.

4. While certain information regarding heat trace, such as manufacturer product specifications, is available to the public, a significant amount of Chromalox's heat trace business information is not publicly available. Tr. 51:24-25; 52:1-13. Such confidential information includes, but is not limited to:

- Corporate growth and heat trace strategies (Tr. 49;18-23; 162:1-4 (Crombie, M., testifying), 162:1-4 (Crombie, M., testifying));

- Company financial information, including margin and profit information relating to products and territories (Tr. 50:2-5; 161:4-5 (Crombie, M. testifying));

- Customer lists and contracts (Tr. 50:5-9; 161:1-3 (Crombie, M. testifying));

- Price lists (Tr. 50:10-11);

- Information regarding new product development and internal projects, such as test data (Tr. 50:11-17; 163:1-10 (Crombie, M. testifying)); and

- Supply chain information (Tr. 50:18-20).

5. Chromalox has taken reasonable measures to limit access, and to protect, its confidential information, including:

- The use of employment agreements containing confidentiality provisions and covenants not to compete. Tr. 52:17-21.

- Internal maintenance of computer network, system security and authentication measures. Tr. 52:21-25.

- Employee training on confidentiality. Tr. 53:1-4.

- Adoption of an employee handbook, discussing confidentiality responsibilities and post-employment restrictive covenants. Tr. 53:5-11.

6. Defendant Mark Crombie began working for Chromalox in its heat trace business segment in 1994. Plaintiff's Exhibit (hereinafter "P-") 15. Chromalox promoted him to Vice President of Heat Trace in 2013, a role he held until his resignation. *Id*.; Tr. 36:23-24.

7. As Vice President of Heat Trace, Mr. Crombie had the highest level of responsibility in the company for the entire heat trace segment on a global scale. Tr. 37:1-2; 38:10-11. At the time of his resignation, he reported directly to Chromalox's then-Vice President of Global Product Marketing and interim President, Christopher Molnar. Tr. 35:15-21.

8. Mr. Crombie was responsible for the growth and sales strategies of the heat trace business segment, international growth and development of the international team, setting prices, and product, patent and new technology development. Tr. 37:3-18. He directly engaged with Chromalox customers and sales channel partners, and worked with Chromalox's sales team. He also was responsible for handling internal employee training regarding heat trace with Chromalox's sales force and sale channel partners. Tr. 37:14-24.

9. Mr. Crombie did not previously work in the heat trace industry until his employment with Chromalox. Tr. 157:14-16 (Crombie, M., testifying). Through his employment, however, he became well known in the heat trace market and built relationships in the industry. Tr. 158:6-8, 25 & 159:1 (Crombie, M., testifying). While at Chromalox, he attended trade shows and drafted articles on heat trace on behalf of Chromalox. Tr. 158:9-21 (Crombie, M., testifying).

10. Mr. Crombie resigned his employment with Chromalox. He submitted a notice of resignation on September 20, 2019, via email, advising that his last day of work would be two

weeks later, on October 4, 2019. P-12; Tr. 53:18-20; 54:1-4; Tr. 165:19-20 (Crombie, M., testifying). He told Chromalox he was leaving to pursue a career in music. Tr. 60:1-12; 166:4-6 (Crombie, M., testifying). To the extent that Mr. Crombie suggests he did not resign, his testimony, and the other evidence, do not credibly support that conclusion.

11. Upon acquiring Chromalox in 2017, Spirax required a small group of top Chromalox executives, including Mr. Crombie, to sign new employment agreements (hereinafter, "the Agreement") as a condition of employment under Spirax. P-4; Tr. 39:7-24; 49:6-9. The Agreement contained confidentiality, non-competition and non-solicitation provisions, incorporated as "Exhibit A" to the Agreement. *Id*. Had an executive refused to sign the Agreement, he or she no longer would be employed. *Id*.

12. Mr. Crombie read the Agreement, including its non-competition, non-solicitation and confidentiality provisions, before he signed. P-4; Tr. 163:11-22 (Crombie, M., testifying). He understood that he would have post-employment obligations under the Agreement, and that he needed to abide by its terms. Tr. 163:23-25 (Crombie, M., testifying); 164:1-4 (Crombie, M., testifying).

13. In the Agreement, Mr. Crombie acknowledged that the nature of his position gave him access to and knowledge of "Confidential Information," including "but not limited to, formulas, patterns, devices, software, patents, patent applications . . . secret inventions, processes, techniques, designs, drawings, developments, equipment, prototypes, sales and client information, client and prospect lists, and business and financial information relating to the business, products, practices, and techniques of the Company Group." P-4 at Exh. A, ¶ 1, 6.

14. The Agreement expressly stated that the Confidential Information referenced therein was of "great competitive importance and commercial value" to Chromalox, "and that

improper use or disclosure . . . is likely to result in unfair or unlawful competitive activity." P-4 at Exh. A, ¶ 1.

15. Mr. Crombie had access to a significant amount of Chromalox's confidential information. Tr. 49:18-21. This included corporate growth and heat trace strategies; strategies and information regarding the execution of Chromalox's other business segments; company financial information, including margin and profit information across different territories and products; sales information; price lists; customer lists; customer contracts and purchase orders; sales channel partners; internal project information and new product development test data; and Chromalox's supply chain information. Tr. 49:18-25; 50:1-21. This information is not publicly available. Tr. 51:24-25; 52:1-8. At the Hearing, Mr. Crombie admitted he had access to many of the aforementioned categories. Tr. 160:22-25 (Crombie, M., testifying); 161:1-16; 162:1-7; 163:1-10.

16. In exchange for signing the Agreement, Mr. Crombie received an increase in base salary, from $141,000 to $167,000 – an 18% increase. P-4; P-5; Tr. 40:2-14. He also became eligible to participate in Spirax's long term incentive plan, a stock share plan granted only to the executive employees who signed the Agreement. P-4; P-7; Tr. 41:19-25; 42:1-7; 46:3-15. The stock share plan was new to Chromalox, and thus not a benefit to which Mr. Crombie was previously entitled. Tr. 46:10-12.

17. Both before and after the Spirax acquisition, Mr. Crombie participated in a bonus plan. The terms of the Spirax bonus plan, facially, were less favorable than under Chromalox's previous plan. Tr. 41:25; 42:1-7. Significantly, however, bonuses paid under both the old plan and the new one were at the discretion of the company; and were not guaranteed.

Calculation benchmarks were tied to both individual and company-wide performance, and the criteria changed every year. Tr. 42:8-17.

18. Under the Spirax stock share plan, Spirax awarded shares to Chromalox executives each year. Tr. 47:7-11. These shares have a three-year vesting period. *Id*.; P-8. Mr. Crombie received 610 shares in 2017, 590 shares in 2018, and 420 shares in 2019. P-9-11; Tr. 47:17-25; 48:1-13. Had Mr. Crombie remained with Chromalox until March 2020, his 2017 award would have vested, and would have been worth approximately $90,000 as of the Hearing. Tr. 48:21-25; 49:1.

19. Under the Agreement, Mr. Crombie agreed not to directly or indirectly work for a company in any business that competes with Chromalox, or for any company he knew had plans to conduct such business, for one year after the end of his employment with Chromalox. P-4 at Exh. A, ¶ 2.

20. Although the content of the Agreement speaks for itself, the Court acknowledges that Plaintiff's proposed findings and conclusions (Doc. 35, "Plaintiff's proposed Fs & Cs"), at ¶¶ 24-27, accurately summarize the same.

21. On his last day of work, Chromalox reminded Mr. Crombie that he was subject to a non-compete provision under the Agreement. P-12; Tr. 59:13-25; 60:1-16.

22. On February 3, 2020, Mr. Crombie began work at ASPEQ/Indeeco ("Indeeco"). Tr. 173:23-25 (Crombie, M., testifying). He first met with Indeeco regarding employment in November of 2019, one month after resigning from Chromalox. Tr. 170:12-24 (Crombie, M., testifying).

23. Indeeco has competed against Chromalox in the North American market for several decades. Tr. 63:19-23. Before hiring Mr. Crombie, Indeeco competed against

Chromalox in the manufacture and sale of industrial heaters and systems and component technology, targeting the same customers as Chromalox. Tr. 63:25; 64:1-5. Indeeco was a competitor of Chromalox prior to Mr. Crombie's hire. *Id*.

24. At or around the time of hiring Mr. Crombie, Indeeco launched a heat trace business segment, and thus now competes against Chromalox across all three of its business lines. P-14; Tr. 65:20-25; 66:1-14. Mr. Crombie admits that Indeeco, like Chromalox, is in the industrial heating and thermal management technologies industry. Tr. 170:16-19 (Crombie, M., testifying). Before he started at Indeeco, Mr. Crombie knew Indeeco intended to enter into the heat trace market. Tr. 171:11-18 (Crombie, M., testifying).

25. Mr. Crombie played a lead role in the launch of Indeeco's new heat trace business segment, and ultimately became the main coordinator of the project. Tr. 173:7-14 (Crombie, M., testifying). The Court finds, by a preponderance of the evidence, that Mr. Crombie used Chromalox knowledge, information and resources to do so.

26. Mr. Crombie began working on Indeeco's heat trace business segment during his first week of employment. Tr. 172:17-21 (Crombie, M., testifying). At some point in his employment with Indeeco, Mr. Crombie worked exclusively on heat trace. Tr. 173:2-6 (Crombie, M., testifying).

27. During his first month at Indeeco, Mr. Crombie prepared a PowerPoint presentation segment called "Heat Trace Vision." P-16; Tr. 173:15-22 (Crombie, M., testifying). In an email later that month, Mr. Crombie's supervisor referenced discussions of trips for Mr. Crombie to "reintroduce himself to former friends" to explore "opportunities for re-engagement on process and EHT[, *i.e.*, electric heat trace]." P-17; Tr. 174:1-22 (Crombie, M.,

testifying).  Mr. Crombie has admitted that this statement referred to relationships he formed at Chromalox.  Tr. 174:1-22 (Crombie, M., testifying).

28.     The Court finds, by a preponderance of the evidence, that Mr. Crombie assisted Indeeco in targeting Chromalox heat trace customers.  He helped put together a potential heat trace customer list that included many Chromalox customers.  P-22-23; Tr. 177:1-20 (Crombie, M., testifying).  Mr. Crombie also provided feedback on those potential customers, said feedback being informed by knowledge acquired from Chromalox.  P-23; Tr. 177:21-23 (Crombie, M., testifying).

29.     Over 75% of potential heat trace customers targeted by Indeeco were Chromalox customers.  P-23; Tr. 75:6-23.

30.     Mr. Crombie created another heat trace presentation for Indeeco, using pictures of Chromalox's heat trace cable warehouse, its Edmonton Canadian facility, and Chromalox's SRH cable that was still a development project.  P-24; Tr. 76:13-25; 77:1-6.  Chromalox invested millions of dollars into developing the SRH cable to give it a marketplace advantage.  Tr. 77:7-13.  Mr. Crombie led this project at Chromalox.  Tr. 77:16-19.  Information on the cable is not publicly available, and the product had not yet gone to market.  *Id*.

31.     Mr. Crombie also assisted Indeeco with making sales that bundled heat trace products with other types of products, like circulation heaters – a business and marketing strategy central to Chromalox.  P-22; Tr. 74:12-24.

32.     The Court finds, by a preponderance of the evidence, that Mr. Crombie retained and accessed Chromalox documents and information – including confidential information – after his resignation, and during his employment with Indeeco.  P-1-3.

33. The Court acknowledges the evidence referenced in Plaintiff's proposed Fs & Cs (Doc. 35) at ¶¶ 41-42, summarizing forensic analyses revealing Mr. Crombie's access to Chromalox computer files on various media storage devices. The Court also acknowledges defense counsel's objections to this evidence. The Court finds – under the standards applicable at the Hearing − that Defendant's objections go to the weight of the evidence, not its admissibility; and Plaintiff's forensic evidence supports the Court's conclusion, by a preponderance of the evidence, that Mr. Crombie retained Chromalox documents and information – including confidential information. Even were the Court to conclude otherwise, there is other evidence in the record independently supporting the Court's determination. *See generally* Pl.'s proposed Fs & Cs (Doc. 35).

34. While at Indeeco, Mr. Crombie created and presented a heat trace training presentation entirely copied from a Chromalox training presentation. P-21; Tr. 73:5-12. The presentation included content and images directly from a Chromalox presentation. Tr. 73:13-19. Chromalox treats and marks its training presentations as "Confidential." Tr. 73:20-25; 74:1-2.

35. Before discussing employment with Indeeco, Mr. Crombie applied for a job with another Chromalox competitor, Bartec. Tr. 169:25 & 170:1-6 (Crombie, M., testifying). Mr. Crombie's application with Bartec stalled, after he revealed his Agreement and its restrictive covenants. Tr. 170:7-11 (Crombie, M., testifying). Thus, Mr. Crombie knew or should have known that the restrictive covenants were problematical with respect to his employment with Indeeco. *See* Tr. 172:1-14.

36. While Mr. Crombie at times has claimed that he was terminated by Chromalox, he did, in fact, resign. *See* discussions *supra*. Mr. Crombie advanced the proposition that he

would provide only two-weeks notice; and the suggestion that he later changed his mind and wanted to remain employed for six months (and thus receive "garden payment" salary) is not credible.

37. The Court acknowledges the evidence summarized in ¶¶ 47-53 of Plaintiff's proposed Fs & Cs (Doc. 35). It suffices to say that the Court finds, by a preponderance of the evidence, that Chromalox did not breach the Agreement in connection with Mr. Crombie's departure.

38. As a mixed issue of law and fact, the Court finds, by a preponderance of the evidence, that Chromalox has suffered, and will continue to suffer, irreparable harm because of Mr. Crombie's conduct. In support of this conclusion, the Court incorporates by reference the content of Plaintiff's proposed Fs & Cs (Doc. 35) at ¶¶ 54-60.

39. In most instances, Defendant's arguments to the contrary serve to emphasize the need for injunctive relief, given the incalculability of damages resulting from the nature of the rights injured, and the lack of certain pecuniary standards for measuring damages. *See* further discussions, *infra*.

## CONCLUSIONS OF LAW

1. Under Fed. R. Civ. P. 65, a plaintiff moving for a preliminary injunction must show: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017).

2. "If these two 'threshold' factors are met, a court then considers the remaining two factors − '(3) the possibility of harm to other interested persons from the grant or denial of the

injunction, and (4) the public interest' − and determines, on balance of all four factors, whether to grant the requested preliminary relief." Id.

3. In demonstrating the likelihood of success on the merits, a plaintiff need not show that it is more likely than not that it will succeed. Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011). Instead, a plaintiff must only demonstrate "a reasonable probability of success on the merits." Am. Express Travel Related Svcs. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012).

4. In other words, a "plaintiff need only prove a *prima facie* case, not a certainty that [it] will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001).

5. To establish a claim for breach of contract, a plaintiff must show (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damage. Church v. Tentarelli, 953 A.2d 804, 808 (Pa. Super. Ct. Ct. 2008).

6. A restrictive covenant is valid under Pennsylvania law if it is ancillary to an employment relationship, supported by adequate consideration, reasonably limited in time and geographic scope and reasonably designed to safeguard a legitimate interest of a former employer. Our Town v. Rousseau, 2017 WL 34698, *6 (M.D. Pa. Jan. 3, 2017) (citation to quoted source omitted).

7. When non-competition covenants are executed ancillary to the sale of a business, they are held to a less "stringent test of reasonableness" than those that are merely ancillary to employment contracts. Viad Corp. v. Cordial, 299 F. Supp. 2d 466, 476 (W.D. Pa. 2003). Restrictive covenants ancillary to the sale of a business are designed to protect goodwill, in addition to physical assets and investments. Id.

8. Employers have a legitimate interest in protecting their confidential information, good will and "the unique and extraordinary skills" of their employees. Victaulic Co. v. Tieman, 499 F.3d 227, 235 (3d Cir. 2007). Not allowing a competitor to profit from an employee's specialized training and skills is a legitimate use of a covenant not to compete. *Id*.

9. Mr. Crombie's restrictive covenants set forth in the Agreement are part of a valid, enforceable contract ancillary to the acquisition of Chromalox by Spirax, supported by adequate consideration, which Mr. Crombie voluntarily entered into.

10. The consideration included a significant raise in guaranteed annual salary, and participation in Spirax's stock share plan. Mr. Crombie's testimony that he did not understand the stock plan, or perceive it to be a benefit, is immaterial. Although unnecessary to the aforementioned conclusions, the evidence establishes that, had Mr. Crombie not resigned, his 2017 award would have, upon-vesting, yielded an estimated value of $90,000.

11. Whether viewed as a matter of fact, law or a mixed question, the Court finds that the changes to Mr. Crombie's bonus plan do not eliminate the existence of consideration. Bonus awards, at all times, were discretionary; they were not tied (exclusively) to Mr. Crombie's performance; the criteria changed every year; and, at bottom, they were not guaranteed. Mr. Crombie cannot negate the existence of consideration by reference to the bonus program(s).[1]

---

[1] Consistent with the Viad Corp. line of cases (cited *supra*), the Court is not entirely convinced that Mr. Crombie's continued employment − after the Spirax acquisition – is inadequate consideration. While continued-employment generally will not suffice, Spirax's newly-acquired authority arguably made Mr. Crombie (and the several other executives who were required to sign the Agreement) more akin to having a new employment relationship. *Compare* Tr. 169:15-17 (Crombie, M., testifying) ("one of the things I learned all along was Spirax, once they said what they were going to [do], that's the way it was going to be") *with* Fancy Fox v. Hanchey, 2018 WL 2126288, *4 (Pa. Super. Ct. May 9, 2018) (recognizing that, "[i]f a noncompetition clause is executed at the inception of the employment [relationship], the consideration to support the covenant may be the award of the position itself"; and employee's retention "by a separate and distinct entity" after ownership-change qualified as consideration). Although the reasoning

12. The Court acknowledges that, like the bonus plan, Spirax's stock plan may be characterized as "unguaranteed." There is a distinction, however, in that Mr. Crombie actually received stock shares; and any uncertainty related only to their ultimate money value upon vesting. On the other hand, bonuses, and the criteria for awarding them, were entirely within the discretion of the company. This distinction aside, moreover, Mr. Crombie's guaranteed increase in base salary was consideration enough.

13. Mr. Crombie's one-year restrictive covenant was necessary to protect a legitimate business interest of Chromalox. *See, e.g.,* Nat'l Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998) ("[plaintiff] seeks to protect its customer goodwill and its business information, both of which courts have recognized as legitimate business interests"); Citibank N.A. v. Kyle, 2015 WL 3755788, *4 (E.D. Pa. Jun. 16, 2015). Mr. Crombie was exposed to Chromalox's confidential and proprietary information; it paid him to interact with customers and build customer goodwill; and it facilitated Mr. Crombie's development of unique skills during his employment − all of which constitute legitimate business interests protectable through a restrictive covenant. *Id.*

14. While there is no geographic limitation in Mr. Crombie's Agreement, courts uphold such agreements where, as here, "the employee's duties and customers were equally broad." PharMethod, Inc. v. Caserta, 382 F. App'x 214, 220 (3d Cir. 2010).

15. Further, geographic scope is non-dispositive because Mr. Crombie's role with Chromalox was international in scope, and he is working for a direct competitor in the United States, developing and selling competing products and interacting with the same nationwide

---

in this footnote may provide an alternative ground − to be clear, the Court relies on the discussions in the main text as its primary, and entirely independent, reasoning.

customers he interacted with while at Chromalox. *See, e.g.,* Quaker Chem. v. Varga, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007) (upholding non-compete agreement lacking geographic scope where employee's former duties and employer's customers were geographically broad, and employer competed with other companies on a worldwide basis).

16. The restrictive covenant's one-year term is reasonable. Viad Corp., 299 F. Supp. 2d at 477 n.3; *see also* Am. Mut. Liability Ins. Co. v. Kosan, 582 F. Supp. 269 (W.D. Pa. 1984); TYCO Fire Prods, L.P. v. Fuchs, 2017 WL 5509889 (Pa. Super. Ct. Nov. 17, 2017).

17. Mr. Crombie breached his contractual obligations to Chromalox by working for Indeeco, competing against Chromalox in the same markets, soliciting Chromalox customers and utilizing Chromalox's information following his resignation.

18. Mr. Crombie has been in breach of his Agreement since February 3, 2020, when he began working for Indeeco. Tr. 126:11-14. Whether, and the extent to which, Mr. Crombie has been "sidelined" at Indeeco does not affect the Court's finding of breach.

19. Although Mr. Crombie's employment with Chromalox ended on October 4, 2019, the Court will, pursuant to the tolling provision in the Agreement (*see* P-4 at Exh. A, ¶ 5), extend the term of the non-compete and non-solicitation provisions by the length of time during which Mr. Crombie was in breach.

20. Chromalox is likely to succeed on the merits of its breach of contract claim against Mr. Crombie. Mr. Crombie is not likely to succeed on the merits of his counterclaims.

21. Mr. Crombie's breach warrants the entry of injunctive relief, which is specifically contemplated in the Agreement. P-4, ¶ 13.

22. Harm is irreparable "when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain

pecuniary standards for the measurement of damages." Bimbo Bakeries USA, Inc. v. Botticella, 2010 WL 571774, *15 (E.D. Pa. Feb. 9, 2010).

23. Harms compensable by money damages (*e.g.*, lost sales from a defendant's actions) are not appropriate grounds for injunctive relief. Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).

24. The "threat of unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business establishes irreparable harm." Healthcare Servs. Group Inc. v. Fay, 597 Fed. App'x 102, 103-104 (3d Cir. Jan. 22, 2015) (citation to quoted source omitted).

25. An impending loss of business opportunities or market advantage may be aptly characterized as an irreparable injury under Pennsylvania law. *See* Nordetek Envtl., Inc. v. RDP Techs., Inc., 677 F. Supp. 2d 825, 843 (E.D. Pa. 2010); Centennial Lending Grp., LLC v. Seckel Capital, 2017 WL 4861625, *6 (Pa. Super. Ct. Oct. 26, 2017); *see also* Masure v. Massa, 692 A.2d 1119, 1122 (Pa. Super. Ct. 1997) (holding plaintiff suffered irreparable injury as number of lost customers cannot be accurately calculated).

26. "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Pappan Enterprs., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998).

27. Using "internal client-specific strategies to compete against a company and potentially sour relationships with current clients can also establish irreparable harm." Mallet & Co. Inc. v. Lacayo, 2020 WL 6866386, *12 (W.D. Pa. Nov. 23, 2020).

28. Additionally, the use of protected information by a competitor is "precisely the genre of the case and the type of injury that most warrants injunctive relief." Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1233 (Pa. Super. Ct. 1989).

29. The irreparable harm Chromalox would suffer without injunctive relief is varied and evident. Mr. Crombie has worked for a direct competitor, in a high-level position, in which he has disclosed Chromalox's confidential information, in violation of his covenants. P-4; P-18; Tr. 63:25; 64:1-5; 73:20-25; 74:1-2; 178:3-8 (Crombie, M., testifying).

30. Any suggestion that a preliminary injunction is unnecessary because the irreparable harm to Chromalox has already occurred is unconvincing. *See, e.g.,* Mixing Equip. Co. v. Philadelphia Gear, Inc., 436 F.2d 1308, 1310 (3d Cir. 1971) (affirming appropriateness of preliminary injunction despite employee already commencing employment with competitor). Such an argument ignores the continuing nature of the harm. *See, e.g*., P-4; P-18; Tr. 63:25; 64:1-5; 73:20-25; 74:1-2; 178:3-8 (Crombie, M., testifying).

31. Absent injunctive relief, the resulting harm would prove difficult, if not impossible, to quantify. *See* Fisher Bioservs., Inc. v. Bilcare, Inc., 2006 WL 1517382, *12 (E.D. Pa. May 31, 2006) ("[I]njury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages."). Injunctive relief is necessary to prevent continued, immediate and irreparable harm. Quaker Chem. Corp., 509 F. Supp. at 484.

32. As for balancing the equities, where a highly placed employee like Mr. Crombie breaches enforceable restrictive covenants by competing against his former employer, "the harm to the employer trumps the harm to the employee." Quaker Chem. Corp., 509 F. Supp. 2d at 480; CentiMark Corp. v. Lavine, 2011 WL 3209106, *5 (W.D. Pa. Jul. 28, 2011).

33. The resulting damage to Chromalox is incalculable, through its loss of business, damage to customer relationships and the loss of protection of its confidential information. *See* Fisher Bioservs., 2006 WL 1517382 at *12. The nature of the relief requested is proportionate to the severity of Mr. Crombie's wrongful acts and the potential harm. *See id*.

34. Based on his experience with Bartec, Mr. Crombie knew, or should have known, that his covenants were problematical to his employment at Indeeco. "The self-inflicted nature of any harm suffered by the wrongdoer weighs heavily in favor of granting preliminary injunctive relief." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano, 85 F. Supp. 2d 491, 498-99 (E.D. Pa. 2000); *see also* HR Staffing Consultants LLC v. Butts, 627 F. App'x 168, 172-74 (3d Cir. 2015).

35. The harm to Chromalox outweighs any harm Mr. Crombie would suffer from being enjoined from continuing his conduct. Furthermore, any harm to Mr. Crombie was a predictable consequence of his breach of the Agreement.

36. As for the public interest, it almost always is advanced where, as here, the plaintiff has demonstrated both a likelihood of success on the merits and irreparable injury. Inst. for Motivational Living, Inc. v. Sylvan Learning Ctr., Inc., 2008 WL 379654, *5 (W.D. Pa. Feb. 8, 2008).

37. The public interest is served by enforcing the restrictive covenants freely entered into by Mr. Crombie. *See* Nat'l Bus. Servs. Inc., 2 F. Supp. 2d at 709 (granting injunction would "discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations"). "Restrictive covenants only have value if they are enforced." Graphic Mgmt. Assocs., Inc. v. Hatt, 1998 WL 159035, *18 (E.D. Pa. Mar. 18, 1998).

Consistent with the foregoing, the Court hereby enters the following:

**ORDER**

Plaintiff's Motion for Preliminary Injunction (**Doc. 3**) is **GRANTED**. The terms of the Preliminary Injunction are as follows. They will not go into effect, however, until after the entry of a security bond under Federal Rule of Civil Procedure 65(c).

  A. **For a period of eight months** from the date of the Court's (forthcoming) order confirming the payment of a security bond, Defendant is enjoined from working for ASPEQ/Indeeco, and/or having direct or indirect contact with any of Chromalox's current or potential customers, where that contact is to sell or otherwise provide any type of product or service offered by Chromalox, or to encourage current or potential customers to cease or not enter into doing business with Chromalox.

  B. Defendant is enjoined from working for any other business that competes with any business that Chromalox conducts, or has specific plans as known to Defendant to conduct, for the aforementioned eight-month period.

  C. Defendant is prohibited − and is enjoined − from retaining, using, disclosing or transmitting Chromalox's confidential information, for any purpose, including to benefit ASPEQ/Indeeco.

The parties promptly shall meet and confer to discuss the terms and amount of a security bond. If they reach agreement, they shall file a joint supplement/motion, including a signature-ready proposed order.[2] If they cannot agree, by **July 7, 2021**, they shall cross-file proposals,

---

[2] Consistent with the guidance in Mallet v. Lacayo, Civil Action No. 19-1409 (W.D. Pa.), the proposed order must include the language, "Funds will be deposited into the Court's local Registry, where it will remain until further Order by the Court." *See* text Order corresponding with Doc. 123 in 19-1409.

including signature-ready proposed orders. The Court summarily will adopt the terms it believes are most reasonable, appropriate and consistent with prevailing law.

    IT IS SO ORDERED.

June 29, 2021                                                s/Cathy Bissoon
                                                                        Cathy Bissoon
                                                                         United States District Judge

cc (via ECF email notification):

All Counsel of Record